IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02761-STV

WILLIAM JENKINS, and
TOBIE JENKINS,

    Plaintiffs,

v.

COREY CHANCE,
MICHAEL HEIDINGER,
ATTILA DENES,
NICHOLAS ARNONE, and
DOUGLAS COUNTY SHERIFF'S OFFICE,

    Defendants,
_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

This matter comes before the Court on Defendants' Motion to Dismiss (the "Motion") [#11], filed by Defendants Corey Chance, Michael Heidinger, Attila Denes, Nicholas Arnone, and the Douglas County Sheriff's Office. The Motion is before the Court on the Parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment. [##13, 14] This Court has carefully considered the Motion and related briefings, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Motion is **GRANTED** and Plaintiffs' Complaint [#1] is **DISMISSED**.

1

## I. FACTUAL BACKGROUND[1]

Plaintiffs' Complaint arises from the tragic death of their son Jayson Jenkins following a three minute interaction with Defendants Corey Chance and Michael Heidinger, deputies with the Douglas County Sheriff's Department. [#1 at 1; #5-1[2] at ¶ f] Early on the morning of February 3, 2015, Jayson discussed suicide with a friend before traveling to a nearby park. [#5-1 at ¶ b] While sitting in a tree grove at the park, Jayson fired a gun[3] he had brought with him "to release some of the emotions which were triggering his talk of suicide." [*Id.* at ¶ c]

When Defendants Chance and Heidinger encountered Jayson, he was sitting with the rifle between his legs and talking to his mother on the phone. [*Id.* at ¶¶ e, m] Defendant Chance approached Jayson with his duty weapon drawn and ordered Jayson to put down his rifle. [*Id.* at ¶ e] Jayson told Defendant Chance he was not going to shoot him or point the rifle towards him. [*Id.* at ¶ p] Believing he was in no

---

[1] The facts are drawn from the allegations in Plaintiffs' Complaint, which must be taken as true when considering the Motions to Dismiss, and the exhibits attached thereto. *See Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011)); *see also Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 965 (10th Cir. 1994) (considering written documents attached to the complaint as exhibits as part of the complaint for rule 12(b)(6) dismissal purposes). Moreover, Plaintiffs' Complaint extensively references several of the attached exhibits, including a summary of facts, which provides the majority of Plaintiffs' factual allegations. [*See generally* ##1, 5-1]; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (A court "must consider the complaint in its entirety . . . [and] documents incorporated into the complaint by reference.").
[2] Citations to documents beginning with [#5] refer to Plaintiffs' attachments to the Complaint, submitted to the Court as two identical thumb drives containing several folders. [*See* #5] For example, [#5-1] refers to the first attachment folder in the thumb drive. When citing to a document within an attachment folder, the Court adds a corresponding notation to the citation format. For example, [#5-16-1] refers to the first document contained in folder 16 in the thumb drive.
[3] It appears that this firearm was a pistol and not the rifle discussed later. [#5-1 at ¶ b (stating Jayson fired his pistol into the ground); #5-8 at 1 (same); # 5-16-3 at 2 (stating that a loaded pistol was found near the scene)]

personal danger, Defendant Chance switched from his duty gun to his Taser. [*Id.*] Jayson asked Defendant Chance to move back and explained he was trying to talk to his mother. [*Id.* at ¶ m] Defendant Chance informed Jayson he could talk to his mother shortly and suggested Jayson talk with him first. [*Id.* at ¶ n]

Jayson placed the muzzle of the rifle in or near his mouth, with his thumb on the trigger, at least once during the encounter. [*Id.* at ¶ r] Plaintiffs allege that despite Jayson threatening himself, Defendant Chance nevertheless continued to pressure him, and disregarded the value of allowing Jayson to speak with his mother. [*Id.* at ¶¶ n, r] Plaintiffs further allege that Defendants never meaningfully attempted to deescalate the situation or radio that they were dealing with a potential suicide. [*Id.* at ¶ f]

While Jayson's thumb was on the rifle's trigger and the "muzzle was near or in" Jayson's mouth, Defendant Chance fired his Taser. [#1 at 1; #5-1 at ¶¶ o, r, s] The rifle and Taser went off "basically at the same time." [#5-1 at ¶¶ u-v] Plaintiffs argue that Jayson involuntarily pulled the trigger because his body convulsed in response to the electrical charge from the Taser. [#1 at 5, 22; #5-1 at ¶¶ x-dd] Plaintiffs allege, therefore, that Jayson's death was caused by Defendant Chance deploying his Taser while Jayson had the rifle in his mouth and his thumb on the trigger. [*Id.*]

On February 4, 2015, the day after Jayson's death, forensic pathology consultant Dr. Michael Burson performed an autopsy and issued a report describing a "self-inflicted gunshot wound to the head" as the cause of death, suicide as the manner of death, and citing to Jayson's alleged suicidal history. [#5-16-2(B) at 7-8] The autopsy noted the existence of a "thermal burn" on Jayson's leg. [*Id.* at 5; *see also* #1 at 19] Douglas County Coroner Jill Romann also completed a report, listing a "self-inflicted gunshot

wound" as the cause of death, and the manner of death as "suicide." [#5-16-2(A); *see also* #5-16-3]

On October 21, 2015, Plaintiffs submitted a detailed "Request for Further Investigation and Information" ("the Request") to Coroner Romann and Dr. Burson, requesting the Coroner's Office to reopen the investigation into Jayson's death, and asking both officials to reconsider listing "self-inflicted gunshot" as the cause of death "if there [wa]s doubt as to whether or not" the Taser impacted "the firing of the Rifle." [#5-16-1 at 22] Plaintiffs also requested that the officials exclude incorrect references to Jayson's suicidal history from their reports. [*Id.* at 5] The Request cites to extensive evidence from a variety of sources to support Plaintiffs' position that the electrical shock from the Taser caused Jayson to pull the trigger. Plaintiffs examined the manual and product information for the Taser used by Defendant Chance and explained that the Taser was "designed to cause 'involuntary muscle contractions,'" such that the Taser "could have inadvertently caused [Jayson] to push the trigger." [*Id.* at 9 (emphasis omitted); *see also id.* at 11 ("These excerpts are related specifically to the TASER X2 deployment relative to the firing of the Rifle and the possibility that [t]he Rifle was triggered by the electricity emitted from the TASER X2." (emphasis omitted))]

Plaintiffs also provided both transcripts and video footage of interviews with multiple parties, including Defendants Denes, Arnone, Chance, and Heidinger, as further evidence that the rifle may have been "triggered by the electricity emitted from the [Taser]." [*Id.* at 11-20; *see also* #5-16 (Videos)] For example, Plaintiffs cited to an interview with Defendant Denes, who stated that the Taser deployment was "possibly what precipitated . . . the shooting to have occurred right exactly when it did." [#5-16-1

4

at 12 (emphasis omitted)] Plaintiffs also included a statement by Defendant Arnone, who recalled that the deployment of the gun and the Taser "was kind of simultaneous." [*Id.* at 15 (emphasis omitted)] Plaintiffs argued that pursuant to Arnone's recollection, it was "clear that the Taser and the Rifle went off at the same time." [*Id.*] Plaintiffs concluded, "[i]t is clear that if [Defendant Chance] deployed the [Taser] while [Jayson] had the Rifle in his mouth, such deployment may be considered at a minimum reckless." [*Id.* at 21]

Plaintiffs filed an additional document titled, "Addendum to: Request for Further Investigation and Information" ("the Addendum"), with Romann and Dr. Burson on February 3, 2016. [#5-17] The Addendum included additional citations to interviews with Defendants, largely repeating the information from the original Request, and also provided more details with respect to the impact of Taser deployment on the body's motor nervous system. [*Id.*]

In 2016, Dr. Burson amended his autopsy report to state the manner of death was "undetermined" and to remove references to Jayson's disputed history of suicide. [#5-4-1 at 2; *see also* #5-6; #12 at 3-4] Dr. Burson continued to report that the cause of death was a self-inflicted gunshot wound of the head. [#5-4-1 at 2] Dr. Burson opined that though Jayson "exhibited suicidal gestures and clearly suffered a self-inflicted gunshot wound of the head[,] there remain questions as to the precise timing of the events which lead up to the firing of the weapon," including whether the deployment of the Taser contributed to the firing of the weapon. [*Id.*] However, Dr. Burson deferred to the Douglas County Coroner for the final determination of Jayson's manner of death. [*Id.*] Plaintiffs did not receive notice of the change in Dr. Burson's report until January

5

10, 2017. [#12 at 3, 4; *see also* #5-4-2] The Coroner, on the other hand, did not change the manner of death listed in her report, and issued a memorandum explaining that decision. [#5-6] After considering in detail the evidence raised in Plaintiffs' Request, including law enforcement interviews, Jayson's mental health history, and an article discussing the impact of a Taser's electrical impulses on a target, the Coroner concluded that the manner of death would remain suicide. [*Id.*] The Coroner noted that "[t]here is a possibility that contact [with the Taser] was made to [Jayson's] right lower leg," but stated that she was in "no position to guess what probability contact was made."[4] [*Id.*] Plaintiffs' Complaint alleges that the Coroner's failure to include or consider the "thermal burn" listed in Dr. Burson's autopsy report is evidence of the Coroner's "direct attempt to cover up and protect" the Sheriff's Department. [#1 at 19]

Plaintiffs filed the instant suit on November 17, 2017 under 42 U.S.C. § 1983, alleging violations of the Second, Fourth, Fifth, and Eighth Amendments. [#1 at 4-8] Defendants filed their Motion to Dismiss on December 12, 2017. [#11] Plaintiffs oppose the Motion [#12], and Defendants have filed a reply [#15].

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nonetheless, a plaintiff may not

---

[4] The Coroner's report suggested that the Taser did not make complete contact with Jayson's body because, if it had, Jayson would not have had reflex ability and would not have been able to pull the trigger. [*Id.*]

6

rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556). The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "The *Haines* rule applies to all proceedings involving a pro se litigant." *Id.* at 1110 n.3. The Court, however, cannot be a pro se litigant's advocate. *See Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

## III. ANALYSIS

Defendants raise three arguments in support of their Motion to Dismiss. [#11] They contend that: 1) the Complaint is untimely; 2) the individual Defendants are entitled to qualified immunity; and 3) the Complaint fails to state a municipal liability claim against the Douglas County Sheriff's Office. [*Id.* at 4] Because Plaintiffs' Complaint is barred by the statute of limitations, the Court only addresses Defendants' first argument below. *See Eyring v. Fondaco*, 667 F. App'x 983, 984 (10th Cir. 2016) (finding no need to consider qualified immunity argument where plaintiff's claims were barred by the statute of limitations, "fully dispos[ing] of" the case); *Smith v. Gonzales*, 222 F.3d 1220, 1222 n.1 (10th Cir. 2000) (same); *see also Romero v. Lander*, 461 F. App'x 661, 669 (10th Cir. 2012) (refraining from addressing plaintiff's constitutional claims because his § 1983 claim was time-barred).

"Section 1983 provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting under color of state law." *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004) (quoting 42 U.S.C. § 1983). Because Section 1983 does not contain a statute of limitations, courts look to the corresponding state statute of limitations. *See Owens v. Okure*, 488 U.S. 235, 236 (1989). "'[T]he statute of limitations for § 1983 actions brought in Colorado is two years from the time the cause of action accrued,' unless this period is equitably tolled." *Romero*, 461 F. App'x at 666 (quoting *Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006)) (citation omitted); *see also* Colo. Rev. Stat. § 13-80-102(1)(g) (establishing a two-year statute of limitations for "[a]ll actions upon liability

created by a federal statute where no period of limitation is provided in said federal statute").

   1. **Accrual**

Defendants argue that Plaintiffs' Complaint is untimely because their claims accrued at the latest on October 21, 2015—the date Plaintiffs filed their Request for a reinvestigation with Dr. Burson and the Coroner—and thus the instant suit, filed on November 17, 2017, is barred by the statute of limitations. [#11 at 4-5] While Colorado law governs the two-year statute of limitations for § 1983 actions, the Court determines when the cause of action accrues under federal law. *Romero*, 461 F. App'x at 666.

As the Tenth Circuit has explained:

> In general, under the federal discovery rule, claims accrue and the statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action. In particular, a civil rights action accrues when facts that would support a cause of action are or should be apparent.

*Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004) (citations and quotations omitted)*; see also Romero*, 461 F. App'x at 666. Accordingly, "it is not necessary that a claimant know all of the evidence ultimately relied on for the cause of action to accrue." *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 632 (10th Cir. 1993). The focus, instead, is "on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm." *Alexander*, 382 F.3d at 1216.

In *Alexander v. Oklahoma*, for example, plaintiffs—the descendants and survivors of a riot caused by a racist mob that killed hundreds in 1921—filed suit in 2003 after a report was released in 2001 detailing the extent to which the city and state were culpable for the riot. *Id.* at 1211-12, 1215-16. The court rejected the plaintiffs' argument that the cause of action did not begin to accrue until the report was released, explaining

that "[t]aken to its logical end, th[at] argument would require [the court] to craft a rule delaying accrual of a cause of action until a plaintiff has detailed knowledge of the level of culpability of each of the actors involved." *Id.* at 1216. The Court refused to establish such a rule because "Plaintiffs' injuries and the general cause of those injuries were obvious in the aftermath of the Riot. To start the running of the statute of limitations, [Tenth Circuit] case law requires nothing more." *Id.*

Likewise here, Plaintiffs knew of the facts necessary to sue and recover damages arising out of Jayson's death, at the very least by the time they submitted the Request on October 21, 2015. The Request demonstrates Plaintiffs' extensive knowledge of the facts that would potentially support their cause of action, particularly their belief in Defendants' culpability. Plaintiffs' Request reads much like a complaint and provides detailed evidence in support of Plaintiffs' contention that the use of the Taser caused Jayson to involuntarily pull the trigger, including that Jayson had a Taser burn on his right leg, which was "inflicted by law enforcement," and that the type of Taser used causes "involuntary muscle contractions." [#5-16-1 at 5-6, 8-9] Plaintiffs go so far as to suggest "the [Taser] could have inadvertently caused [Jayson] to push the trigger" and that the rifle may have been "triggered by the electricity emitted from the [Taser]." [*Id.* at 9, 11]

Plaintiffs included interviews from multiple Defendants, including Denes, who stated that the Tasing was "possibly what precipitated . . . the shooting to have occurred right exactly when it did" [*id.* at 12], and Arnone, who recalled that the deployment of the gun and the Taser "was kind of simultaneous" [*id.* at 15]. Plaintiffs concluded that it was "clear that the Taser and the Rifle went off at the same time." [*Id.*] Given the level

10

of detail and specific facts offered in Plaintiffs' Request, and the extent to which that information goes to the heart of the instant suit, the Court must conclude that Plaintiffs knew or had reason to know of both the existence and the cause of the injury at least by October 21, 2015—more than two years prior to filing the Complaint on November 17, 2017.

Plaintiffs respond that they learned the critical fact to their suit upon receipt of Dr. Burson's amended autopsy report, altering the manner of death from "suicide" to "undetermined," on January 10, 2017. [#12 at 3; *see also* #5-4-1 at 2; #5-4-2] But the amended report did not provide Plaintiffs with additional information. Instead, it merely gave potential support to Plaintiffs' previously-held belief that Jayson did not commit suicide. [#5-4-1 at 2] And the update to the report was apparently prompted by Plaintiffs' Request. [*See, e.g.*, #5-4-1 at 2 ("The fact that the decedent was 'Tazed' by law enforcement prior to firing the weapon presents uncertainty as to whether or not this action contributed to the firing of the weapon."); #5-6 (recognizing that Dr. Burson had been incorrectly informed of Jayson's suicidal history, and noting that Dr. Burson had since removed statements about that history from his report after Plaintiffs submitted their Request)] But, as in *Alexander*, even if the amended report offered new proof of Defendants' culpability, it does not change the fact that Plaintiffs' theory of the cause of Jayson's death was well known to them by at least October 21, 2015. Thus the accrual of Plaintiff's cause of action was not delayed as Plaintiffs sought even more detailed information. *See Alexander*, 382 F.3d at 1216; *Gualtier v. United States*, 837 F. Supp. 360, 363-64 (D. Kan. 1993) (holding, in a Federal Torts Claim Act action, that claims accrued at the time of plaintiffs' suspicions of decedent's cause of death, not when a

new medical opinion was obtained, because the statute of limitations begins to run once "plaintiff is aware of the 'critical facts' underlying his injury and its cause"), *aff'd*, 25 F.3d 1057 (10th Cir. 1994).

Plaintiffs further argue that even assuming the point of accrual occurred prior to when they received the amended autopsy report, accrual should date back to the filing of their Addendum on February 3, 2016. [#12 at 3] But that document predominantly reiterated information from the original Request. [#5-17] And because the initial Request demonstrated Plaintiffs had sufficient knowledge for the statute of limitations to accrue, the Addendum does not impact the Court's analysis.

## 2. Equitable Tolling

Plaintiffs seem to suggest that, in the alternative, equitable tolling should apply to extend the limitations period. Again, Plaintiffs argue that they did not receive the "crucial information" changing the manner of death from "suicide" to "undetermined," which they believed necessary to initiate the instant lawsuit, until receiving Dr. Burson's amended report. [#12 at 3-5] Plaintiffs contend that the statute of limitations should have been tolled until January 10, 2017—the date they received the report after an unspecified delay. [*Id.*]

"At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1168 (D. Colo. 2010) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005)); *see also Bullington v. United Air Lines Inc.*, 186 F.3d 1301, 1310 n.3 (10th Cir. 1999) ("Rule 12(b)(6) is a proper vehicle for dismissing a complaint that, on its

face, indicates the existence of an affirmative defense such as noncompliance with the limitations period"), *implicitly overruled on other grounds as recognized by Boyer v. Cordant Techs.*, 316 F.3d 1137, 1140 (10th Cir.2003). Because Congress did not establish tolling rules for § 1983, "state law governs the application of tolling in a civil rights action." *Alexander*, 382 F.3d at 1217. Under Colorado law, "equitable tolling of a statute of limitations is limited to situations in which either the defendant has wrongfully impeded the plaintiff's ability to bring the claim or truly extraordinary circumstances prevented the plaintiff from filing his or her claim despite diligent efforts." *Romero*, 461 F. App'x at 666 (quoting *Brodeur v. Am. Home Assurance Co.,* 169 P.3d 139, 149 (Colo. 2007) (en banc)).

Several courts have concluded that delays in autopsy reports and medical records do not necessitate equitable tolling. In an analogous case from the Eighth Circuit, plaintiffs argued that the statute of limitations in a civil rights case should be tolled because they did not have access to an autopsy report until 1984, though the decedent had died in 1960. *Williams v. Hartje*, 827 F.2d 1203, 1206 (8th Cir. 1987). The court rejected that argument, reasoning that "failure on the part of the plaintiffs to obtain that report prior to 1984 is not the same thing as fraudulent concealment" by the defendants. *Id.* While plaintiffs "suggest[ed] that the existence of the autopsy report was somehow concealed" from them for over two decades, plaintiffs "offer[ed] no evidence" to support that contention. *Id.* Similarly, in *Frederick v. Ellett*, plaintiff argued that the statute of limitations did not begin to run until the day she received the autopsy report. No. ST-11-CV-381, 2014 WL 785051, at *2 (V.I. Super. Nov. 8, 2017). Plaintiff had requested the autopsy report numerous times but did not obtain it until several

months after the report was completed.  *Id.* at *1, *2.  The court found that there was "no evidence of actual concealment," nor evidence that the defendant had taken "affirmative steps to conceal," and thus the statute of limitations was not tolled.  *Id.* at *3.

By contrast, in *Stump v. Gates*, this Court held that the statute of limitations period was tolled where "plaintiffs had no way of knowing that a viable wrongful death claim existed" prior to receiving a grand jury report concluding that the decedent's death was a homicide and not a suicide.  777 F. Supp. 808, 822 (D. Colo. 1991).  In that case, both the police investigation and coroner's report had concluded that suicide was the cause of death, and "[t]hereafter[,] nearly all relevant evidence of the cause of death was destroyed by one or more of the alleged co-conspirators."  *Id.*  It was only upon receiving the grand jury report that plaintiffs "bec[a]me aware of any possible grounds for a wrongful death action, grounds that until then had allegedly been wrongfully concealed by the defendants."  *Id.*

As discussed above, and by contrast to the plaintiffs in *Stump*, Plaintiffs' Request here demonstrates that they clearly understood the grounds for a potential suit against Defendants, irrespective of the change in the autopsy report, which at most leant minimal support to Plaintiffs' already-held belief that Jayson did not commit suicide.  Accordingly, Plaintiffs can prove no set of facts that toll the statute.  *See Matthews*, 744 F. Supp. 2d at 1168.  Even if the amended autopsy report had included information critical to Plaintiffs' cause of action, Plaintiffs, like the plaintiffs in *Williams* and *Frederick*, have simply offered no evidence that any Defendants purposely concealed the amended report.  Though Plaintiffs argue that the Coroner's actions, including her failure to consider the leg injury listed in the autopsy report, suggested she was part of a

14

cover up, Plaintiffs do not suggest that the Coroner's actions prevented them from filing the instant lawsuit and the Coroner is not a defendant here. [#1 at 19] Plaintiffs also do not claim that Dr. Burson, who again is not a defendant, purposely impeded their ability to file their suit by his delay in providing them with the amended autopsy report. [*See* #12 at 4 ("Movants do not doubt Dr. Burson's integrity or sincerity." (emphasis omitted))] As such, Plaintiffs have failed to meet their burden to show that Defendants wrongfully impeded them from filing the instant lawsuit or that truly extraordinary circumstances prevented them from filing their claims despite diligent efforts. *See Romero*, 461 F. App'x at 666. Plaintiffs' suit, filed over two years after October 21, 2015—the latest possible date their claims accrued—is untimely. In so holding, the Court is cognizant that Plaintiffs' Complaint alleges "a sympathetic set of circumstances," but because the claims are time-barred, the Court can "express no views on their merits." *Id.* at 669.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion [#11] is **GRANTED** and Plaintiffs' Complaint [#1] is **DISMISSED WITH PREJUDICE.**[5]


DATED:  April 30, 2018                    BY THE COURT:


                                          s/Scott T. Varholak
                                          United States Magistrate Judge

---

[5] *See, e.g.*, *Gatrell v. City & Cty. of Denver*, No. 10-cv-02311-REB-KLM, 2012 WL 219434, at *4 (D. Colo. Jan. 23, 2012), *recommendation adopted*, 2012 WL 592889 (D. Colo. Feb. 22, 2012); *see also Gee v. Pacheco*, 627 F.3d 1178, 1181 (10th Cir. 2010) (affirming dismissal with prejudice of claims barred by statute of limitations).